No. 32,766

THE STATE OF KANSAS, *Appellee*, v. JOHN HARTSOCK, *Appellant*.

(58 P. 2d 1144)

Opinion filed July 3, 1936.

W. P. Waggener, J. M. Challiss, O. P. May, all of Atchison, Keefe O'Keefe and Benjamin F. Endres, both of Leavenworth, for the appellant.

Clarence V. Beck, attorney general, Earl B. Swarner, assistant attorney general, Maurice P. O'Keefe, county attorney of Atchison county, and William Reilly, county attorney, of Leavenworth county, for the appellee.

The opinion of the court was delivered by

BURCH, C. J.: John Hartsock was convicted of murder in the first degree, and appeals.

On November 16, 1933, Hartsock shot and killed Frank Case at the farm of Grover Young, in Atchison county. After a trial, Hartsock was convicted of murder in the first degree. On appeal to this court the judgment was reversed and a new trial was ordered. (State v. Hartsock, 140 Kan. 428, 37 P. 2d 36.) A change of venue was taken to Leavenworth county, where Hartsock was again convicted of murder in the first degree.

Hartsock and Case were neighbors of Grover Young. On the day of the homicide, Young asked Hartsock and Case to help Young to hull clover, and after noon both men went to Young's farm for that purpose. Hartsock took along a loaded .38-caliber, six-shot pistol, carried in a sheepskin bag which served as a holster, and which could not be useful in hulling clover. Hartsock arrived first, stopped at the Young barn, and was requested by Everett Woods to take some gasoline, to be drawn from a tractor near the barn, to a tractor in the field. While Hartsock was waiting for Woods to get the gasoline, Case drove into the Young yard and engaged in conversation with Mrs. Young. The Case wagon had a hayrack on it, and Case was standing on the hayrack. Hartsock left the vicinity of the barn, and went to the place where Case was talking to Mrs. Young. An encounter soon followed, in which Case was killed.

After the homicide Hartsock went to the sheriff's office and said he had shot Frank Case. That evening Hartsock told the sheriff that while Hartsock was on the way to the Young farm he met Case, who was going to another farm for the hayrack. The sheriff related what Hartsock said:

"They met there in the road and stopped and had an argument about the letters. Again Hartsock asked for the letters from Case. Case said he would not give them to him and they argued a minute or two and Case called him a vile name and that Hartsock went on to the Young farm and Case went to the Symns farm to get the hayrack."

Hartsock also gave the sheriff the following account of the shooting:

"Pat (Hartsock) said he walked up to where they (Mrs. Young and Case) were standing, where they were talking, and again asked that Case give him the letters. He says: 'I am going to get those letters from you right now. Make you give me those letters right now.' At that he pulled his gun out. Hartsock said Case turned wild eyed, stuck his hands up in the air and jumped, and as he jumped I shot."

The deputy sheriff was present when Hartsock made the statements narrated by the sheriff. The deputy sheriff testified as follows:

"While going over to Young's, east of Case's he (Hartsock) met Case going over to the Symns farm for a hayrack. Pat (Hartsock) stopped and said that he asked for some letters that belonged to him and that Case said: 'Try and get them, you yellow s. b.' So they separated and Hartsock went to the Young farm. Hartsock was down there with Everett Woods by the tractor getting ready to take some gasoline out to the field. While there Case drove into the Young farm and Hartsock said he went up to the house and he again asked for the letters. He said: 'I want those letters.' He said Case stood up on the wagon with his hands up. As he was standing on the wagon, his eyes were glaring, wild looking. 'At that time then,' he said, 'I shot.' "

The letters were letters supposedly compromising to Hartsock and a woman. Grover Young testified that Case told Young if Young knew what was in the letters his blood would curdle. Hartsock and Case had had trouble about the letters before, and the following is a sequence of facts, differing in important particulars from Hartsock's view of what the evidence established, but derivable from the evidence:

There was bad feeling between the two men respecting a subject which Hartsock was bringing to a culmination. He wanted the letters badly, and he wanted them "now." A meeting occurred in the road as the two men were virtually on their ways to the Young farm to hull clover. Controversy about the letters followed. Hartsock was in truth afraid of Case and, although armed, submitted to being called yellow, and to being called a vile name. Hartsock arrived at the Young farm first, and was asked to take gasoline to a tractor in the field. Immediately after Case arrived, Hartsock saw Case talking to Mrs. Young. Seeing this, taking gasoline out to the field was a matter which could wait, and Hartsock was spurred to action concerning possession of the letters. Case had no letters with him, and Hartsock had no assurance Case had any

letters with him, but, inflamed by the indignities he had just endured, and by the tete-a-tete between Case and Mrs. Young, and having his gun with him, he went to the place where Case was talking to Mrs. Young, prepared for trouble and bent on trouble. He renewed the controversy about the letters in the presence of Mrs. Young, who was not ignorant of what the trouble was about. Before Case said anything or did anything, Hartsock drew his gun. When Case made his first move, Hartsock began shooting. Then followed a struggle between the two men on the ground, to be considered later. When the affair was over, Case had been shot three times with Hartsock's pistol, once in the chest, once in the abdomen, and once in the back. Each wound was doubtless fatal.

After the encounter the pistol contained five empty shells and one unexploded cartridge. There was expert testimony that five bullets had been fired into Case's clothing, and that the two bullets entering the front of Case's body had been fired from a distance of a couple of yards, and probably more. There was expert testimony to the contrary. Persons who were at the Young farm, and who were or soon became extreme partisans of Hartsock, said they heard only three shots. Hartsock told the sheriff he remembered only one shot. At the trial Hartsock admitted three shots were fired. He accounted for the two extra empty shells by saying the morning of the very day of the homicide he saw a coyote trying to get some chickens and fired two shots to scare the wolf away.

Guilt of Hartsock does not depend on whether he fired three shots or five shots at Case, but it may just as well be said here, once for all, that the credibility of the testimony of Hartsock, and of other witnesses in his behalf, was a matter for the jury, and the verdict of guilty draws to its support all evidence, and all rational inferences from evidence, which tend to support the verdict.

The bullet fired into Case's abdomen, below and to the left of the umbilicus, went through the kidney on that side, and went out at the back, opposite to the place it entered, but some three inches higher. The bullet fired into Case's chest entered on a line with the nipples, about half an inch to the right of the sternum, and came out behind, slightly to the left of the backbone. It punctured some blood vessels leading to the heart, if not the heart itself. The third bullet entered Case's back, slightly below the shoulder blade, and came out to the right and below the right nipple. There it entered the right arm near the elbow, coursed down the arm, and lodged.

Immediately after the homicide Everett Woods removed the empty shells from the pistol, threw them on the ground, and gave the unexploded cartridge to Grover Young. A few days later Woods picked up the empty shells and threw them into the creek.

Case was taller and heavier than Hartsock. Hartsock testified that Case leaped from the hayrack upon Hartsock, struck Hartsock on the jaw, and a struggle ensued on the ground. Hartsock's story of this struggle was as melodramatic as the dime novel in which the villain tried to throw the hero over the brink of the cliff, but finally himself met death on the jagged rocks far below.

In the struggle, Case tries to push the pistol into Hartsock's stomach, with intent to kill. Horror and suspense should be registered here. The effort fails. The pistol is forced upward until it is under Hartsock's chin. There are fingers in the trigger guard. Whose fingers they are Hartsock does not know. He cannot tell whether they are his own fingers. Hartsock feels the pressure of the hammer of the pistol going back. More horror and suspense should be registered here. Death seems as inevitable to Hartsock as to the beautiful maiden at the sawmill, bound to the log carriage moving resistlessly and relentlessly toward the cruel teeth of the spinning saw. In this instance the lady in the picture comes to Hartsock's rescue, and struggles for the pistol. Mrs. Young testified Case, a married man, had made love to her, a married woman. When Case drives into the Young yard, Mrs. Young comes to Case's wagon at Case's call. In the struggle between the two men and the woman, Case gets a mortal wound. A .38-caliber bullet goes entirely through his body in a vital region. Still the titanic struggle goes on. Case gets another mortal wound. Another .38-caliber bullet goes entirely through his body in a vital region. The paralyzing shocks of these gunshot wounds do not weaken the adversary's grip on Hartsock's throat. Finally, choked and strangled so he cannot breathe, with everything turning black, and just as he is about to pass out, Hartsock gets possession of the gun, and then to save his own life, shoots the dead or dying Case in the back. That breaks the hold of the villain, and the lady leads the hero, who still has the gun, away. Hartsock was somewhat disheveled and had a cut on his lips and some scratches on his face and neck. Hartsock testified the first two shots were accidental, but no accidental shot went wild. Neither Hartsock nor Mrs. Young was hit. Every bullet went home in Case's body with deadly effect.

The material features of Hartsock's story are found in an appendix to this opinion.

It remains to consider whether prejudicial error was committed at the trial.

For years previous to the day of the homicide, Everett Woods worked for Grover Young, and at the time of the trial he worked part time for Hartsock. As indicated, he opened Hartsock's pistol and threw the empty shells on the ground. A day or two later he gathered up the shells and threw them into the creek. What induced him to place what might be material evidence beyond reach? He said he did it because every time he would go by "it would always renew that."

There was evidence that from the time of the homicide the Youngs took the side of Hartsock. At the trial Woods was asked if the Youngs had given him a watch. He said they did. He was then asked if he was given the watch for concealing the shells. He answered, "No." Hartsock says there was not the slightest evidence that Woods had been bribed. Whether Woods had been influenced by the Youngs was what the state was inquiring about, and was what the state had a right to inquire about.

Some witnesses who testified concerning Hartsock's reputation as a law-abiding citizen were asked if their opinions would be changed if they knew Hartsock carried a gun in violation of law, and the subject of Hartsock's carrying a gun in violation of law was brought into the case. It is said there was no evidence Hartsock ever carried a gun in violation of law.

Hartsock testified he carried a gun for years. He testified the sheriff gave him permission to carry a gun, but he was not to take it to dances or to town. The sheriff denied he had ever given Hartsock permission to carry a gun, and the jury settled that question of veracity.

The Youngs testified the sheriff said he had given Hartsock permission to carry a gun. The sheriff denied making the statement, and the jury settled that question of veracity. If the gun were always carried unconcealed this effort to establish authority to carry it was superfluous.

Hartsock then sought to excuse going about the country flaunting a deadly weapon on his person. He was a member of the C. P. A., an organization the purpose of which was to protect against theft

of chickens and livestock, and Hartsock acted as an officer of the organization. He had not paid dues in the organization since 1932. Then Hartsock said he had no purpose in carrying the gun. Then he said he carried it for protection. Then he said he had just formed the habit. One lone witness testified he had seen Hartsock carry a pistol when hunting, and the jury were not obliged to believe Hartsock was in the habit of carrying the pistol before the trouble about the letters became acute.

There was evidence warranting an inference Hartsock was carrying the pistol in violation of law on the day of the homicide.

Everett Woods testified as follows:

"I first saw Pat Hartsock when he was at the north barn. He was headed north to go to the clover field. I stopped him and told him I wanted him to haul out a can of gas for me. He had to turn his team partially around to go back to the tractor."

As indicated, the tractor referred to was one from which gasoline was to be drained for Hartsock to take to the field. Hartsock was carrying the pistol in the sheepskin bag, which served as a holster. It will be observed Woods did not suggest that Hartsock was carrying the holster strapped on him in a manner perfectly visible to all assembled and assembling clover hullers, as he was in the habit of doing everywhere.

Mrs. Young testified as follows:

"John Hartsock came there that day near one o'clock. He was driving a team and he was riding on a hayrack. . . .

"Hartsock went down to the barn where Everett Woods was, which was less than a half block from the house."

These observations were fairly distinct and complete, but Mrs. Young did not say Hartsock was carrying the holster strapped on him, visible to all observers, as was his wont.

Mrs. Young testified that when Case came, and called her over to his wagon, Case told her he had had a quarrel with Hartsock down the road. Then Hartsock came up and said something that caused an argument. She said she stopped five feet from Case's wagon and remained there until Case leaped off the wagon. She testified at both trials concerning the leap.

Mrs. Young knew Hartsock well. She had made a trip to Wyoming with her husband, Hartsock accompanying them. She had written letters to Hartsock. He had been at her home. At the first trial she said she "did not remember" whether she had been auto-

mobile riding with Hartsock at night. So we have this situation: Case calls Mrs. Young and tells her he had just had a quarrel with Hartsock. Hartsock forsakes his errand for Woods, comes to the place where Case and Mrs. Young are talking, and starts an argument. Hartsock says that what he said concerned delivery of the letters. It is not likely any jury would conclude that when, under these circumstances, Mrs. Young heard Hartsock's voice starting that kind of argument, she kept her back toward Hartsock all the time. She did not say he was carrying his sheepskin pouch or his gun, as he always did. She said positively she did not see gun or pouch, as she must have done, at some time between Hartsock's arrival at the Young farm and the argument Hartsock started, if the pouch and gun were not concealed under Hartsock's clothing.

Hartsock contends he was denied privilege to cross-examine the sheriff.

A newspaper reporter, O'Neil, was present when Hartsock made his statement to the sheriff and deputy sheriff. The county attorney was also present. The reporter wrote an account of the interview, which was printed in his paper. The sheriff testified he had read the article, and it was identified. On cross-examination, the sheriff was asked the following question:

"I will ask you to state if that article as you read it stated substantially the facts and the story that was given by you to Mr. O'Neil of the *Globe,* and the deputy sheriff and Mr. O'Keefe."

An objection to the question was sustained.

The sheriff was not asked if he had given the story to O'Neil. There was no evidence or offer to show O'Neil got his story from the sheriff. The article showed on its face O'Neil was pretending to give his own account of the interview.

The question as printed above is taken from Hartsock's abstract. The question is printed the same way in Hartsock's brief. Assuming the words, "given by you to O'Neil," etc., were understood as if they were, "given by Hartsock to O'Neil," etc., the sheriff's understanding of what might and might not be substantial, and the sheriff's opinion regarding differences between his own story and O'Neil's story were utterly inconsequential.

There were material differences between the newspaper article and the sheriff's testimony. The sheriff had testified, and the article was introduced in evidence. The sheriff might have been cross-examined with respect to those differences, but the cross-examination steered clear of that subject.

The attorneys for defendant stated to the court the sheriff had said once, if not a number of times, that the newspaper story was practically correct. The sheriff was not asked whether he had made such a statement to somebody at some time and at some place, as was necessary to lay the foundation for impeachment, and Hartsock's contention he was denied privilege to cross-examine the sheriff is without merit.

Hartsock complains because instructions which he requested, based on the theory there was no testimony he carried a concealed weapon, were refused. From what has already been said, it is manifest the district court was obliged to give an instruction to the jury on the subject of carrying a concealed weapon. On the first appeal the judgment of conviction was reversed because an instruction to the jury on that subject was insufficient. At the second trial a full and correct instruction was given, and the requested instructions were properly refused.

Hartsock contends that certain instructions were given to the jury, correct in themselves, but not applicable to the facts of the case. The trouble with Hartsock's brief is, he recognizes no facts except those favorable to himself, as he interprets the evidence. The instructions given were necessary for the guidance of the jury in the event interpretations of the evidence which the jury were authorized to adopt, were adopted.

Hartsock contends the county attorney was guilty of misconduct in his closing argument to the jury, and he was. Some of the county attorney's lapses were provoked by utterances such as the following from the opening argument from Hartsock:

"In my candid opinion this is about the weakest lawsuit that I have ever seen, and I really believe were it not that politics has crept into it, a condition where a vigorous, ambitious young prosecutor desires to dethrone Mr. Waggener from his political position in Atchison, I do not believe this case would have ever found its way into court. I want to say that Fletcher [sheriff], of Atchison county, and Joe Lorenz [deputy sheriff] and the coroner are the dumbest outfit I ever saw. What ought to be done in this case is for the county attorney to file an information against them for obtaining money from Atchison county under false pretenses. . . . There is a terrible teapot tempest in the official teapot of Atchison county about this case."

There is an adage to this effect: "Touch pitch and be defiled." The defense handled pitch, and smeared itself. In all instances, most of them of slight consequence, in which the county attorney transgressed the limits of proper argument, the jury were promptly and adequately instructed. One matter requires special notice.

As indicated, when Hartsock gave his account of the killing to the sheriff, undersheriff and county attorney, Cotton O'Neil, a reporter for the Atchison *Globe,* was present. He reported the interview for his paper. He was not called as a witness for the state. In the opening argument to the jury for Hartsock appears the following:

"There is one man that—those statements were not taken down by the sheriff or anybody there—but there was a newspaper reporter by the name of Cotton O'Neil there and he put down in writing almost immediately afterward for a news item for the Atchison *Globe* just what Hartsock said following the killing in that interview in the sheriff's office. . . Why didn't they bring O'Neil? We could not use him. They will say, 'Why didn't we put him on as a witness?' We could not put on a witness as to a self-serving declaration. We have the newspaper article and they objected to it, and it was out, and we did not get the benefit of it."

Hartsock was privileged to call O'Neil as a witness to contradict the sheriff and deputy sheriff, if Hartsock had any desire to do so. Hartsock's abstract shows O'Neil's article was introduced in evidence by Hartsock as his exhibit 6, and such portions of the article as Hartsock chose to print appear in the abstract. If the article was excluded, it was properly excluded under the hearsay rule. The matter of the cross-examination of the sheriff concerning this subject has already been discussed.

As indicated, O'Neil's article did not correspond with the testimony of the sheriff and deputy sheriff. In the closing argument for defendant appears the following:

"Cotton O'Neil did publish an item that he wrote while this matter was fresh in mind that was published in the Atchison *Daily Globe,* but it is not a matter we have been permitted to read. Why was not Cotton O'Neil here to testify in this case? He has been reporting this trial, and yet he was not permitted to testify. That is for the county attorney to tell you."

In his closing argument the county attorney met this tacit charge of suppressing important evidence, and told the jury all about why Cotton O'Neil was not called as a witness for the state.

At the first trial O'Neil was placed on the witness stand, and gave answers to some questions which are not now of any importance. He then became sick and was excused. That afternoon he went to the county attorney and said:

"I have been to Mr. Waggener (attorney for Hartsock), and I told him the sheriff and deputy sheriff told the truth, but please, Maurice (the county attorney), don't put me on the stand and make me out a damned liar and a damned fool."

O'Neil also told the county attorney he would be obliged to tell the same story the sheriff told the jury. To save O'Neil from embarrassment and from possible loss of his job as reporter for his paper, the county attorney did not call O'Neil as a witness. The defense having challenged the county attorney to tell why he did not use O'Neil as a witness, the county attorney was privileged to tell why. In this instance, the privilege was not abused. A good discussion of this subject may be found in the opinion in the case of *Siberry v. The State*, 133 Ind. 677, 682, 33 N. E. .681.

A contention that the verdict was not supported by evidence is without merit, and the motion for new trial was properly denied.

The judgment of the district court is affirmed.

#### Appendix

"When I got there I said: 'Frank, have you got those letters?' And he said, 'You yellow s. b., and flew on to me, and threw his lines to the air and jumped right off onto me. . . .

"He socked me one in the jaw, on my face, and he grabbed the gun with the other hand. When he grabbed, something busted loose and he got hold of it and fetched it out and when he fetched it out, Mrs. Young was standing a distance from us. Case grabbed hold of the gun and I grabbed hold of it and he stuck the gun up into my face. Then Mrs. Young grabbed hold of something and tried to get the gun and I pulled it away from her after Case poked it over and pushed it against me. Some fingers 'was in the trigger pit. I don't know whether they were mine. I don't know whether they were Case's, but it went off. We were down on the ground. Case gave it another jerk and as he turned and done that it went off. He had me down just choking the devil out of me. I was trying to get loose. I just got away and reached around with the gun and fired it in his right shoulder. He had his hand around my throat and everything was getting black. After that shot was fired, that broke his hold. . .

"We were struggling on the ground, rolling around a distance of about thirty-nine feet from where Case first jumped on to me. . . . The first shot was fired sometime during the scuffle. It was accidental. Both shots were. Case was trying to put it under my jaw. In some manner I turned the thing. There was three of us scuffling with it and then it went off. . .

"When he jumped on to me he hit me in the mouth and grabbed hold of the gun and we both fell. He hit me in the head. I won't say just exactly where he hit me. He grabbed for the gun. It was about half way out when I grabbed for it, too. He grabbed it and was pulling it out and I grabbed it too, because I didn't want it out of there. The gun was torn off of me. He got the gun and he held it and tried to push it into my stomach. I got down to one side. Mrs. Young came along. She was standing beside there. He had that thing under my chin trying to pull the trigger. I could feel the pressure of the hammer coming back and I knew he was trying to fill me up or something. Mrs. Young grabbed hold of the barrel and swerved it around to one side.

Some way or another I rooted around and the gun got turned and it went off and he give it another jerk and it went off again. We were all fighting for it. I was fighting for the gun which had been torn off of me. I guess he was doing the same thing and trying to turn it onto me. It went off two times accidentally. I fired a third shot. He had so choked me I could not breathe. I was jerked, thugged and kicked. He just paraded me around on the ground like a hog rooting a barrel. Tumbled, rolled and stumbled over everything. When we fell he had his knees on my side and back. I could not move. He was just bringing it right into my stomach and I cinched around and got away. I do not know where it hit him. He let loose of the gun and it fell down on the ground like that. · He pulled on my arm, but he had the gun in his hand. He had me down and was choking me what seemed like an hour, and I don't think it was under two minutes or something. I was gradually fading away. He was choking and strangling me. I just struggled and got the pistol around and shot under the right shoulder. I then staggered up. Mrs. Young got hold of me and led me down towards the north barn.

"Q. You were both lying flat on the ground struggling, he one side and you the other? A. When he was choking me.

"Q. When he was choking you. Who had the gun then? A. I did.

"Q. You had the gun? A. In my hands.

"Q. When did you get the gun? A. Well, after these two accidental shots were fired.

"Q. Who fired those shots in Case's body, these accidental shots? A. I testified—I didn't know whether Case or me. When he was choking me I pushed him with that thing (meaning the gun.) He would not let loose and I pulled the trigger when I was about gone. [This is referring to the shot in the right shoulder.]"